United States District Court

For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SENITULI PENISONI,

          Petitioner,

   v.

JAMES WALKER, Warden,

          Respondent.

_____/

No. C-10-1040 EMC (pr)

**ORDER DENYING PETITION FOR
WRIT OF HABEAS CORPUS**

## I.   INTRODUCTION

Senituli L. Penisoni, a state prisoner at California State Prison - Sacramento, has filed a *pro se* petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging his 2006 convictions for first degree murder and several counts of attempted murder, and resulting sentence.  The petition is now ready for a decision on the merits of the petition.  For the reasons discussed below, the petition will be denied.

## II.   BACKGROUND

A.   The Crimes

The California Court of Appeal summarized the evidence of the crimes presented at trial:

> The primary witness for the prosecution was Luis Manuel Vargas.  At the time of trial, Vargas was 22 years old and had two children with Margarita Osuna, his common-law wife of six years.  On Friday March 19, 2004, he went to his mother's home in East Palo Alto to retrieve his car, a red Mustang that he'd bought about three weeks before from Rigoberto Alvarez.  Vargas learned when he bought the Mustang that someone previously shot at Alvarez as he was driving the car.  After Vargas retrieved the car and drove the car away from his mother's house, however, it stalled at a stop sign on Larkspur Street.  Suddenly, a car cut in front of his and blocked the road.  A young black man

got out of the car, put a pistol to Vargas's head, and asked him if he claimed to be from the "Sac," a gang associated with Sacramento Street in East Palo Alto. Vargas denied he was from the Sac Street gang.  Just at that point, another young black man who knew Vargas pulled up in a white Mustang and began yelling at the man with the gun that Vargas lives in Hayward and does not belong to the Sac.  Vargas had never seen the gunman before but knew the other man as a neighbor back when he lived in East Palo Alto.  The gunman removed the pistol from Vargas's head and drove off.  Vargas said the other man driving the white Mustang was known in the neighborhood as "Pooh."

Vargas talked to Pooh for about fifteen minutes, and Pooh told him that there were problems right now between the Sac Street gang and a gang from the Alberni street area.  Vargas then drove to Alvarez's house to talk to him about getting rid of the red Mustang.  Vargas parked in front of Alvarez's house, but Alvarez was not at home.  Just then, two individuals known to Vargas as "Tuli" (defendant Senituli Penisoni) and "Turtle" (defendant Ricardo Arana) stopped to talk to Vargas.  Tuli and Turtle were in a blue van that Vargas had seen Tuli driving in the past.  Vargas told them he'd almost been killed on account of the red Mustang because someone put a pistol to his head thinking he was a member of the Sac Street gang.  Tuli and Turtle asked Vargas what the man looked like.  When Vargas told them it was a black man with short hair, they said for sure it must be Dontae.  [FN2] Vargas had never heard of Dontae.

> FN2.  Dontae Hurd was arrested for the murder of Lisa Hernandez, who was shot to death in East Palo Alto on June 21, 2003.  Lisa was in the passenger seat of a car driven by her boyfriend, Armando Valencia, known to police as a member of the Sac Street gang.  They were parked at a strip mall waiting to pick up Lisa's sister from work.  A man walked up to the car, called out "Yo, Sac Street" and fired.  Valencia was hit in the leg and Lisa died from a gunshot to the chest.  Valencia described the shooter as a short black male driving a small black car he recognized as associated with the Midtown Hogs, a gang from the Alberini area.  Subsequently, Valencia made a statement to Lisa's sister that Dontae was present but was not the shooter, so the police could take care of Dontae and Sac Street would take care of the shooter.  Valencia's statement resulted in dismissal of charges against Dontae Hurd.  Hurd was released around February 22, 2004, and returned to the Alberini district.

Tuli asked Vargas to show him where the incident happened.  Vargas got in the passenger seat and Turtle moved to the back seat.  When he got into the van, Vargas saw Tuli had a gun right next to his leg.  Vargas said he "wasn't leery" because he'd "always seen them with guns" so it did not surprise him.  Moreover, an hour had gone by so he knew no one would be at the place where the incident happened.  Vargas directed Tuli towards the stop sign on O'Connor Street where he'd encountered the gunman.  After that, Tuli started to go back to Alvarez's house but then turned right down Wisteria Way.  Vargas noticed "a group of black people [who] were talking to a young man that was inside a car.  And then Tuli said to Turtle, 'Look at them niggers.'" Vargas said the group of black people could not be seen from O'Connor Street.  He did not direct Tuli to turn right down Wisteria Way.

Regarding the shooting, Vargas stated: "It happened very quickly, the van went next to the car and the shooting began."  He recalled hearing two shots just as

United States District Court

For the Northern District of California

the van pulled level with the blue car, then he ducked down to his left.  Tuli leaned over him and began firing a gun out the passenger side window.  From his position, Vargas could see towards the rear and he saw that Turtle was shooting out of the van too.  The firing stopped, Tuli pressed the accelerator, and then Vargas got up to see what was happening.  He noticed Turtle was still pointing his gun out of the van to the rear.  All of the van's windows were broken.

It seemed to Vargas that Tuli was lost because he made different turns and came back to the same place.  No one said anything.  They got to Pulgas Street and from there Tuli drove the van to an apartment complex and parked it.  Everyone got out of the van and Turtle began to gather up empty shell casings.  Vargas heard Tuli call his sister and tell her to report the van stolen.  Then Vargas grabbed his hat and walked off in one direction, and Tuli and Turtle walked off in the opposite direction.  Vargas saw them throw the casings over a fence next to the freeway.  Vargas never spoke to them about the shooting and did not see them again until he appeared in court.

Vargas said he did not have a gun that day and denied firing any shots from the van.  Before the shooting, neither Tuli nor Turtle told him they were going to shoot someone, or he would never have gone inside the van.  As he walked away from the van, Vargas was nervous thinking about what had just happened.  He picked up his car and drove home to Hayward.  He called his mother and told her everything that had happened.  He also told his wife Margarita about it.  Vargas said he was afraid defendants would harm him if he called the police because he knew they were in the Sac Street gang.

The shooting took place in front of a house on Wisteria Way in East Palo Alto, where Dellory Crooks testified he lives with his mother and brings his children, aged 10 and 6, every day after school.  Just prior to the shooting, Crooks stated he was out front talking with his friend, 43-year old Donald Prince, who had pulled up partially onto Crooks's driveway with his vehicle facing into the direction of oncoming traffic.  Prince's friend Sugar Ray Porter was with him in the front-passenger seat of the vehicle.  As the group conversed, Ortega Barnes drove down the street in a little four-door Toyota, drew up alongside and parallel to Prince's car, and joined the others.  As the four were chatting, a blue van drew up alongside Barnes's car.  Prince saw the barrel of a gun sticking out of the van and then the shooting began.  Crooks, Prince and Porter dove, scrambled and crawled to cover away from the vehicles.  Prince was shot in the leg.  Barnes was armed and returned fire at the van from his vehicle, but received multiple gunshot wounds to the chest and died shortly thereafter from his injuries.  [FN3]

> FN3.  A P-85 Mark II .9mm Ruger semi-automatic pistol was found in Barnes's car and it was matched to 13 casings found at the scene.

The prosecution called several other witnesses in its case-in-chief.  Clint Powell testified that he pulled his vehicle over on Wisteria because he'd spilled some soda.  In his rear-view mirror, he noticed a dark blue minivan coming up behind him.  There were at least two people in the van, maybe more – one of two occupants was Hispanic and the other was Samoan or Tongan.  Powell described the driver to the police as a Hispanic male adult with a very large build.

Tina Reed testified that she lives on Wisteria Way. She heard some shots while she was out in front of her residence with a group of people. Right after she heard the shots, she saw a van flying through a stop sign at about 45 m.p.h. She noticed the back window and the front-passenger side-window were broken, and saw two persons in the front of the van and one in the rear. Reed thought they were lost because she knew they were heading for a dead-end and would have to come back around to the same stop sign. She saw the van again when it reappeared and described the driver as Mexican, with curly hair in a ponytail, big-shouldered and wearing a red shirt.

The prosecution also called several police officers and crime scene investigators who presented evidence pertinent to their investigation. Evidence thus adduced showed that the shooting was called in to the police at 12:45 p.m. on Friday March 19, 2004. At 1:35 p.m., the police received a call about a blue Ford Arrowstar van parked at the Light Tree Apartment complex on East Bayshore. At 1:45 p.m., defendant's (Tuli's) sister, Alice Penisoni, placed a 911 call to report that her blue Ford Arrowstar had been stolen. Sergeants Denton and Lopez of the San Mateo County Sheriff's Office went to interview Alice Penisoni in response to her 911 call. By that time, police had examined the vehicle at the Light Tree apartment complex, had linked it to the shooting, and were suspicious about the timing of Alice Penisoni's stolen vehicle report. Also, Denton knew the van was connected with the Penisoni household and had seen Tuli driving it in the past. Upon contacting Alice, Denton challenged her story about the van having been stolen, told her the van had been involved in a shooting in which someone had died, and advised her to tell the truth. Alice testified at trial that her bother Tuli phoned her on the day of the shooting and told her to call 911. Tuli instructed her to tell the police she drove the van to the Stop 'n Shop on Bayshore and that it was stolen from there. Alice said that Tuli came by the house once on Saturday or Sunday, ate and left, and did not sleep at the house again until he was arrested five days later.

On Sunday evening, police received a call from a female that Luis Vargas may have information about a homicide that occurred on Friday. Police tried unsuccessfully to track the call. On Tuesday March 23, police received a call from the same female subject who identified herself as Margarita Osuna. She stated Luis Vargas was the father of their child, said he was at an address in Hayward and that he was planning on leaving the area. Vargas was not at the address when police responded but was subsequently contacted after a vehicle driven by Rigoberto Alvarez was stopped. Vargas was in the car with Alvarez and Jose Gutierrez. Vargas agreed to talk to the police and was interviewed at length about the events of Friday March 19 by Detective Gary Ramos of the San Mateo County Sheriff's Office.

Detective Ramos began by asking Vargas what he'd done this past weekend. Vargas seemed nervous. At first he said he was at a friend's house in Redwood City on Friday. Detective Ramos did not think Vargas was being truthful because "he just seemed to be stumbling around, seemed to be able to forget things on Friday, but not on Saturday or Sunday." Ramos challenged Vargas's statements but Vargas insisted he was telling the truth. During a break, officers informed Detective Ramos they had just taken a statement from Vargas's mother and told Ramos what she had said. Ramos then confronted Vargas, and told him that "either his mother was lying to me or he was lying to me about his involvement." After that Vargas "just seemed to open up" – he broke down crying and told Ramos he would tell the truth. Detective Ramos

United States District Court
For the Northern District of California

said Vargas was "quite concerned that if he did tell us the truth that himself or his family would be harmed." Vargas identified defendants to Ramos only as Tuli and Turtle, never by their surnames. He described to Ramos what they wore at the time of the shooting, stating that Turtle wore a white T-shirt and dark pants or jeans with a red hat or sweatshirt, and that Tuli wore a black T-shirt and blue jeans. After evaluating the information Vargas provided against what the police already knew about the shooting, Detective Ramos decided Vargas was "more of a witness in the case." Ramos stated that Vargas was placed into the Witness Protection Program and relocated out of the area around December 2004 after the preliminary hearing.

Several items of evidence recovered from the blue Ford van were also introduced into evidence by the prosecution. A receipt from the Mi Rancho Market dated March 19 at 11:39 a.m. was lying across the ashtray in the front seat of the van. A fingerprint found on the receipt was matched to the left index finger of defendant Ricardo Arana ("Turtle"). Arana's prints were also found on a plastic bag found inside the van. Detective Ramos went to the market and asked to see surveillance tapes from around that time of day. On the tapes, Arana is seen wearing a white T-shirt and dark pants, purchasing the items shown on the receipt at the time shown on the receipt, and leaving the store carrying the items in a white plastic bag.

Resp. Ex. 10 at pp. 3-8.

B.   Procedural History

At a joint jury trial in San Mateo County Superior Court, Penisoni and his co-defendant, Arana, were found guilty of first degree murder of Ortega Barnes, *see* Cal. Penal Code § 187(a), the attempted murder of Donald Prince, Dellory Crooks, and Ray Porter, *see* Cal. Penal Code §§ 187(a), 664, and maliciously discharging a firearm at an occupied dwelling house and motor vehicle, *see* Cal. Penal Code § 246. The jury also found true that, in relation to Count 1, Penisoni and Arana intentionally discharged a firearm, *see* Cal. Penal Code § 12022.53(c); intentionally discharged a firearm causing great bodily injury to Ortega Barnes, *see* Cal. Penal Code § 122022.53(d); intentionally and with premeditation murdered Ortega Barnes by discharging a firearm from a vehicle, *see* Cal. Penal Code § 190.2(a)(21); and personally used a firearm in the commission of the offense, *see* Cal. Penal Code § 1203.06(a)(1). In addition, the jury found firearm allegations true, in relation to Counts 2-4. *See* Cal. Penal Code §§ 12022.53(c), 1203.06(a)(1). On September 7, 2006, both Penisoni and Arana were sentenced to a life term without the possibility of parole, plus a determinate term of 45-years for the remaining counts.

Penisoni and Arama timely appealed. The California Court of Appeal affirmed the judgments. The California Supreme Court denied review. Resp. Ex. 13. Penisoni filed his federal

5

United States District Court
For the Northern District of California

1   petition for writ of habeas corpus.  The Court issued an order to show cause why the petition should

2   not be granted.  Respondent filed a motion to dismiss for failure to exhaust.  Doc. No. 6.  Although

3   Penisoni requested a stay of his federal petition so that he could return to exhaust his state court

4   remedies, the Court determined that he was not eligible for a stay, and dismissed Claim 2 and a

5   portion of Claim 3 for failure to exhaust.  Doc. Nos. 9, 10.  Respondent has now filed an answer.

6   Penisoni has filed a traverse.  The matter is ready for a decision on the merits.

7                              **III.   STANDARD OF REVIEW**

8          This Court may entertain a petition for writ of habeas corpus "in behalf of a person in

9   custody pursuant to the judgment of a State court only on the ground that he is in custody in

10  violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  The

11  Antiterrorism And Effective Death Penalty Act of 1996 ("AEDPA") amended § 2254 to impose new

12  restrictions on federal habeas review.  A petition may not be granted with respect to any claim that

13  was adjudicated on the merits in state court unless the state court's adjudication of the claim:

14  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly

15  established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in

16  a decision that was based on an unreasonable determination of the facts in light of the evidence

17  presented in the State court proceeding."  28 U.S.C. § 2254(d).

18         "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court

19  arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the

20  state court decides a case differently than [the] Court has on a set of materially indistinguishable

21  facts."  *Williams (Terry) v. Taylor*, 529 U.S. 362, 412-13 (2000).

22         "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the

23  state court identifies the correct governing legal principle from [the] Court's decision but

24  unreasonably applies that principle to the facts of the prisoner's case."  *Id.* at 413.  "[A] federal

25  habeas court may not issue the writ simply because that court concludes in its independent judgment

26  that the relevant state-court decision applied clearly established federal law erroneously or

27  incorrectly.  Rather, that application must also be unreasonable."  *Id.* at 411.  A federal habeas court

28  making the "unreasonable application" inquiry should ask whether the state court's application of

1 | clearly established federal law was "objectively unreasonable." *Id.* at 409.

2 | **IV.   DISCUSSION**

3 |      Penisoni claims that: (1) the trial court's refusal to give jury instructions on lesser included
4 | offenses deprived him of his right to have every element proven beyond a reasonable doubt; (2) his
5 | right to due process was violated by the admission of gang evidence; and (3) the exclusion of
6 | evidence of the victim's bad character denied Penisoni his right to present a defense.  The Court will
7 | address each claim in turn.

8 | A.    Lesser Included Offenses

9 |      Penisoni claims the trial court violated his right to a due process by failing to give *sua sponte*
10 | instructions on the lesser-included offenses of voluntary manslaughter and attempted voluntary
11 | manslaughter.[1]  The state appellate court disposed of this claim on state law grounds.

12 |      Penisoni is not entitled to habeas relief on this claim.  Simply put, he has not shown that he
13 | has a clearly established federal constitutional right to have the jury instructed on a lesser-included
14 | offense.  It is clear the failure of a state trial court to instruct on lesser-included offenses in a
15 | non-capital case does not present a federal constitutional claim.  *See Solis v. Garcia*, 219 F.3d 922,
16 | 929 (9th Cir. 2000).  Penisoni concedes the same.  Traverse at p. 5.

17 |      There is an exception under circuit law that "the defendant's right to adequate jury
18 | instructions on his or her theory of the case might, in some cases, constitute an exception to the
19 | general rule." *Id.* at 929 (citation omitted).  Nonetheless, Penisoni is not entitled to relief under this
20 | putative exception because circuit precedent does not constitute clearly established federal law under
21 | AEDPA.  *Renico v. Lett*, 130 S.Ct. 1855, 1865-66 (2010).  Further, even if the failure to instruct on
22 | the lesser-included offenses was erroneous, Penisoni cannot demonstrate that the error had a
23 | substantial or injurious effect in determining the jury's verdict.  *See Brecht v. Abrahamson*, 507 U.S.
24 | 619, 637 (1993); *Messer v. Runnels*, No. 07-15151, 2009 WL 1464899, at ** 2 (9th Cir. 2009)

25 |

26 |      [1] Penisoni argues that the state courts misconstrued his claim.  Traverse at p. 1.  He asserts
27 | that his constitutional claim is that the failure to instruct on the absence of provocation violated his right to due process.  However, the failure to instruct on the absence of provocation – an element of voluntary manslaughter – is a necessary part of the greater claim that the trial court failed to instruct
28 | the jury on the lesser-included offense of voluntary manslaughter.

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1   (unpublished memorandum disposition) (applying *Brecht* in a non-capital case to a claim that the

2   trial court failed to instruct on the lesser-included offense of involuntary manslaughter).  *Cf. Ghent v.*

3   *Woodford*, 279 F.3d 1121, 1133-34 (9th Cir. 2002) (applying *Brecht* to a capital case for failure to

4   instruct the jury on a lesser-included offense).  Because the jury found all the elements to convict

5   Penisoni of the greater offense of second degree murder, the failure to give instructions on the lesser

6   included offense of voluntary manslaughter did not actually result in prejudice.  *See Brecht*, 507

7   U.S. at 637.

8          Therefore, the California Court of Appeal's rejection of Penisoni's claim was not contrary to,

9   or involve an unreasonable application of, clearly established Supreme Court precedent, nor was it

10  based on an unreasonable determination of the facts.  *See* 28 U.S.C. § 2254(d).  Penisoni is not

11  entitled to federal habeas relief on this claim.

12  B.     Gang Evidence

13         Penisoni claims that admission of his gang association was more prejudicial than probative,

14  and violated his right to due process by rendering his trial fundamentally unfair.  The state appellate

15  court rejected his arguments based on state law, and concluded that "[a]ny danger of undue prejudice

16  was strictly limited by the trial court's instructions that the evidence could only be considered for

17  motive, and that the jury was not to be influenced by passion or prejudice."  Resp. Ex. 10 at pp. 22-

18  23.

19         Penisoni's argument cannot warrant federal habeas relief.  The United States Supreme Court

20  has never held clearly that the introduction of propensity or other allegedly prejudicial evidence

21  violates due process.  *See Estelle v. McGuire*, 502 U.S. 62, 75 n.5 (1991) ("we express no opinion on

22  whether a state law would violate the Due Process Clause if it permitted the use of 'prior crimes'

23  evidence to show propensity to commit a charged crime"); *Holley v. Yarborough*, 568 F.3d 1091,

24  1101 (9th Cir. 2009) (the United States Supreme Court "has not yet made a clear ruling that

25  admission of irrelevant or overly prejudicial evidence constitutes a due process violation sufficient

26  to warrant issuance of the writ").  Because there is no Supreme Court precedent that controls on the

27  legal issue raised by a petitioner in state court, the state court's decision cannot be contrary to, or an

28  unreasonable application of, clearly-established federal law.  *Carey v. Musladin*, 549 U.S. 70, 77

United States District Court

For the Northern District of California

1   (2006); *see, e.g.*, *Moses v. Payne*, 555 F.3d 742, 760 (9th Cir. 2009) (holding that where balancing

2   test for excluding evidence is creation of Ninth Circuit law and Supreme Court has not directly

3   considered whether trial court's exercise of discretion to exclude evidence violated defendants'

4   constitutional right to present evidence, state court's failure to use Ninth Circuit's balancing test is

5   not contrary to or an unreasonable application of clearly established Supreme Court precedent).

6       In addition, this circuit has held that the admission of prejudicial evidence may violate due

7   process, but "[o]nly if there are no permissible inferences the jury may draw from the evidence."

8   *Jammal v. Van de Kamp*, 926 F.2d 918, 920 (9th Cir. 1991).  Gang evidence is admissible when

9   relevant to a material issue in a case.  *United States v. Abel*, 469 U.S. 45 (1984) (gang evidence

10  admissible to show bias); *see also Windham v. Merkle*, 163 F.3d 1092, 1103-04 (9th Cir. 1998)

11  (gang evidence relevant to establish motive for crimes).

12      Here, the state appellate court concluded that, according to state law, the gang evidence was

13  relevant to the material issue of motive.  Because this inference is permissible, the admission of the

14  gang evidence did not violate due process.  *See Jammal*, 926 F.2d at 920.  Further, the jury was

15  specifically instructed that the gang evidence could only be considered for the limited purpose of

16  establishing a possible motive for the shooting.  *Weeks v. Angelone*, 528 U.S. 225, 234 (2000) ("A

17  jury is presumed to follow its instructions.").

18      Even assuming the gang evidence was improperly admitted, the error did not have "a

19  'substantial and injurious effect' on the verdict."  *Brecht*, 507 U.S. at 623.  Vargas was in the van at

20  the time of the shooting with Penisoni and Arana, identified both of them as the shooters, and

21  described the events leading up to and during the shooting in detail.  A supermarket surveillance

22  tape showed Arana buying food on the day of the shooting, contrary to Penisoni and Arana's theory

23  of defense that they were at the Jimenez residence at that time.  Just before 12:45 p.m., Barnes was

24  shot and killed.  Witnesses Clint Powell and Tina Reed's descriptions of the driver of the van at the

25  time of the shooting were plausible matches to Penisoni's appearance.  At 1:35 p.m., the van was

26  found abandoned.  Officer Denton recognized the van as being connected to Penisoni's family and

27  had seen Penisoni driving it previously.  Ten minutes later, Penisoni's sister called the police to

28  falsely report – on Penisoni's urging – that the van was stolen.  Penisoni cannot demonstrate that,

1   absent the gang evidence, it is reasonably probable that the jury would have voted to acquit.

2   Accordingly, no prejudice has been established because, even if the challenged evidence had not

3   been admitted, it cannot be said that the resulting verdict would have been any different. *See id.*

4   C.      Exclusion of Victim's Bad Character

5           Penisoni claims that the trial court erred in granting the prosecutor's motion *in limine* to

6   exclude evidence Barnes' prior bad acts and criminal record, and thereby denied him his right to

7   present a defense.  Specifically, the prosecutor moved to exclude a videotape of a drive-by shooting

8   several weeks before the underlying crime, in which it shows a car similar to Barnes', and someone

9   shooting from the driver's side toward an oncoming car.  After Barnes' death, the gun recovered

10  from Barnes' car matches the casings recovered from the videotaped shooting.  Penisoni's co-

11  defendant, Arana, argued that the evidence of the earlier drive-by shooting should be admitted to

12  demonstrate the possibility of some prior personal disagreement between Barnes and Vargas rather

13  than any gang activity.  The trial court deferred ruling on the motion until there was further

14  evidence, and the defense could show that Barnes' prior record was relevant.  The trial court also

15  directed that defense counsel would have to provide some kind of link between the drive-by

16  shooting and the underlying criminal case.  Counsel for Arana conceded that "that's fair."  Then,

17  during the prosecution's case-in-chief, the prosecutor moved to admit evidence of Penisoni and

18  Arana's gang associations to show motive for shooting.  The parties again discussed the videotaped

19  drive-by shooting, and the trial court stated:

20              Well, . . . a trial's a search for the truth and if the allegations are that
                [defendants] are doing something to promote the Sac Street gang's interests at
21              the expense of the Mid Town Hogs, then it should be explained I think that Mr.
                Barnes was an active member of that gang and the other truthful things that
22              occurred on that day should come out, which is that he was firing back at them,
                he had other weapons and paraphernalia.  [¶]  I would agree that the earlier
23              shooting is irrelevant because no one can say with any certainty that's him and
                whether or not he has a prior record [may] or not be relevant. . . .  So we would
24              have to wait to, if that evolves as the defense then someone can ask to bring a
                motion to introduce evidence that would be relevant in that sense, does that
25              sound fair?

26  Resp. Ex. 10 at p. 13.

27          The state appellate court denied Penisoni's claim, concluding that he failed to preserve it for

28  appeal.

United States District Court
For the Northern District of California

First, defendants' claim fails at the threshold because it was not preserved for appeal. As the colloquies recited above demonstrate, counsel accepted the trial court's ruling that evidence of Barnes's alleged involvement in an earlier drive by shooting was irrelevant absent an assertion of self-defense, subject to a further offer of proof that it was relevant on some other basis, such as evidence of a prior personal dispute between Barnes and Vargas. Having failed to make any such further offer of proof, defendants may not object at this point to the exclusion of the evidence. (*People v. Ramos* (1997) 15 Cal.4th 1133, 1179 [defendant failed to preserve issue for appellate review where he failed to explain relevance of evidence or otherwise establish its admissibility, citing Evid. Code, § 354]; *cf. People v. Morris* (1991) 53 Cal.3d 152, 190, disapproved on another point by *People v. Stansbury* (1995) 9 Cal.4th 824, 830 fn.1 [motion in limine is a "sufficient manifestation of objection to protect the record on appeal" only if, inter alia, it advances a "specific legal ground for exclusion [which is] subsequently raised on appeal and . . . the motion is made at a time before or during trial when the trial judge can determine the evidentiary question in its appropriate context"].)

Defendants now assert, for the first time on appeal, that evidence of Barnes's criminal record and involvement in another drive-by shooting was relevant and admissible as further support for the idea that Barnes, not defendants, fired the first two shots. However, defendants never presented this theory of relevance to the trial court and may not predicate error on a theory they did not present below. (*People v. Panah* (2005) 35 Cal.4th 395, 481 ["Since defendant did not seek admission of the testimony as third party culpability evidence, he forfeited any claim that it was improperly excluded for that purpose"]; *People v. Sanders* (1990) 51 Cal.3d 471, 508, [defendant did not preserve challenge to the validity of the pretrial identification for appeal on grounds not stated in his motion to suppress].)

Resp. Ex. 10 at p. 14.

Respondent argues that this claim is procedurally defaulted. A federal court will not review questions of federal law decided by a state court if the decision also rests on a state law ground that is independent of the federal question and adequate to support the judgment. *Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991). In cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice. *Id.* at 750. Where the state court decision rests on clearly alternate grounds, one invoking a state procedural bar and the other addressing the merits, the state procedural ground is still sufficiently independent to preclude habeas review. *See Bargas v. Burns*, 179 F.3d 1207, 1214 (9th Cir. 1999)

United States District Court

For the Northern District of California

The procedural bar here arises from California Evidence Code section 354.  Section 354 requires that Petitioner make the "substance, purpose, and relevance of the excluded evidence" known to the trial court to preserve the issue for appellate review.  Petitioner could also satisfy section 354 by demonstrating that making an offer of proof to the trial court would have been futile.  Cal. Evid. Code § 354(b).[2]  Petitioner did not do either of these at trial.  This Court agrees with several sister courts that California Evidence Code section 354 is an adequate and independent state procedural rule.  *Williams v. Sisto*, No. 07-5342 CW, 2010 WL 530086, at *8-9 (N.D. Cal. Feb. 8, 2010) (holding that Cal. Evidence Code § 354, regarding failure to make proper offer of proof at trial, constitutes independent and adequate state procedural rule under *Wainright v. Sykes*, 433 U.S. 72, 87-88 (1977)); *Rogan v. Henry*, No. 97-4460 BZ, 1999 WL 375603, at *3-4 (N.D. Cal. June 4, 1999) (concluding that California Evidence Code § 354 was independent and adequate state bar).

A federal court may hear the merits of a procedurally defaulted claim only if the petitioner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law.  *Coleman*, 501 U.S. at 750.  Here, Penisoni fails to address the California Court of Appeal's finding that he waived this argument by failing to preserve it below.  Accordingly, Penisoni has not demonstrated cause, actual prejudice, or that the failure to hear the claim would constitute a miscarriage of justice.  *See Sawyer v. Whitley*, 505 U.S. 333, 339-40 (1992); *McCleskey v. Zant*, 499 U.S. 467, 493-94 (1991).  This claim is procedurally barred.

Alternatively, even if this claim were not procedurally barred, Penisoni would not be entitled to federal habeas relief.  The constitutional right to present a complete defense includes the right to present evidence.  *Jackson v. Nevada*, 688 F.3d 1091, 1096 (9th Cir. 2012).  But the right is only implicated "when the evidence the defendant seeks to admit is 'relevant and material, and . . . vital to the defense.'"  *Id.* (quoting *Washington v. Texas*, 388 U.S. 14, 16 (1967)).  Where a state criminal defendant asserts that the exclusion of evidence at trial violated his right to present a defense, a

---

[2] The California Court of Appeals did not specifically reference a California Evidence Code section in its opinion.  However, its conclusion that Penisoni failed to preserve the issue raised is based on the fact that Penisoni failed to make an offer of proof or make known to the trial court the relevance of the allegedly "erroneous exclusion of evidence."  *See* Cal. Evid. Code § 354.  Thus, this Court will consider the independence and adequacy of section 354 in its analysis of Penisoni's claim.

**United States District Court**
For the Northern District of California

1   federal habeas court must consider the value of the evidence in relation to the purposes purportedly

2   served by its exclusion to determine whether a constitutional violation has occurred.  *Id.* at 8666.

3          Here, Penisoni's defense was an alibi.  At trial, he testified that the van involved in the

4   shooting was his family's van, and that it could be started without a key.  Resp. Ex. 5 at p. 16.

5   According to Penisoni, on the morning of the shooting, he and Arana went to the Jimenez residence.

6   Resp. Ex. 5 at p. 16.  At some point, another friend, Aaron Kelly, went out to the van to retrieve a

7   hand towel, and when he returned, Kelly told them he saw someone driving away Penisoni's van.

8   Resp. Ex. 5 at pp. 16-17.  Because Penisoni was "high," he did not want to call the police or his dad

9   at that time.  Resp. Ex. 5 at 17.  Arana was with Penisoni, and while they were at the Jimenez

10  residence, they heard a report of a shooting on the police scanner, and then heard a description of the

11  vehicle involved, which was his van.  Resp. Ex. 5 at 17.  It is difficult to ascertain how admission of

12  evidence implicating Barnes in a prior drive-by shooting, or Barnes' prior criminal history, would be

13  "vital" to the defense theory of alibi.  The California Court of Appeal determined that, even if

14  Penisoni had properly preserved this claim for appeal, there was no error because Penisoni failed

15  "either to assert a claim of self-defense or to show it was relevant to another material issue in the

16  case, such as a prior or ongoing dispute between Vargas and the victim that might indicate Vargas

17  had a motive to commit the crime."  Resp. Ex. 10 at p. 15.  The state appellate court's conclusion

18  was not unreasonable.  Accordingly, Penisoni is not entitled to federal habeas relief on this claim.

19  ///

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

**V.    CONCLUSION**

The petition for writ of habeas corpus is **DENIED** on the merits.  A certificate of appealability will not issue.  *See* 28 U.S.C. § 2253(c).  This is not a case in which "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

The Clerk shall close the file.


IT IS SO ORDERED.


Dated:  November 2, 2012

_____
EDWARD M. CHEN
United States District Judge

United States District Court

For the Northern District of California

14